Good morning, Your Honors. My name is Traeger Mockaton. I represent Nugget and its surety in this proceeding. The proceeding arises out of a judgment entered by the district court. The question, primary question this court should address is whether three Miller Act claimants who supplied. There's a real shortage of authority. Pardon me? There's a real shortage of authority on this telescoping idea. There's some very old Ninth Circuit authority that says it's okay if, I can't remember the exact words it used, but basically it's okay if there was an intention to use the intermediate as a sham and very little else. Is there any authority that says there's no such thing as telescoping? Your Honor, I would answer that this way. There is no direct decision on telescoping in Alaska. It is Nugget's position. What about anywhere else? To me, this is a Miller Act case rather than an Alaska contract case. I am not aware of any authority to that effect, Your Honor. And what is telescoping? Didn't Judge Holland here simply apply a fidelity deposit and say, you know, he looked at the conduct and he found that there was an implied in fact contract. He said that has the effect of telescoping, if you will, or conflating might be another term. So what is it that's in error here? The description of telescoping, I believe, is subterfuge, a straw man, or a paper party. Which he found based on the course of conduct and the support agreement. That is what the district court found, Your Honor. And what's our standard review on that? We believe that you treat this as a summary judgment decision and must grant all And that, Your Honor, is one reason why I believe that Judge Holland's telescoping decision cannot stand. So there, because there's no such thing as a finding on summary judgment, you're saying that what he has to do is find that there's no genuine issue of fact about whether the intermediate company was used as a sham, and he can't on this evidence since there are affidavits saying the contrary. Correct, Your Honor. I believe there is conflicting material fact on this point. All right. What in the record shows whether or not – is there anything in the record to show whether or not the agreement between Nugget and Spencer was secret, that they kept it from the vendors and so forth? Is there anything in the record? I think it is fair to state that the agreement was not disclosed to the vendors. I think it's also fair to state that the agreement was not disclosed to the vendors.  Was the agreement disclosed with the intent to keep them out of the loop? No, I don't believe it's fair to make that inference. I think the proper inference is that this was an agreement between Spencer Rock Products and Nugget Construction. And Nugget Construction decided that whether it was disclosed or not is not a matter for it to disclose to Spencer Rock Products' vendors, and nor is there any law that would require that. The context in which this arose was the situation where Nugget had a contract with the government to build a rock revetment on the Homer Spit in Homer, Alaska. Nugget entered into a material supply agreement with Spencer Rock Products to supply that rock. Spencer Rock Products then, without Nugget's input or involvement, entered into three agreements with the three Miller Act claimants to provide goods and services. And then Miller couldn't perform, and then Nugget said, you can use my machinery, and but you'll have to all take it out of what I might owe you. And it turned out there wasn't enough money left over. And I guess the real important question was, was all this done as a sham, as a fraud, secret, et cetera? No. I don't believe there is. All of this was — it was actually the bank that approached Spencer and said, you need to enter into this supply agreement with Nugget, or this support agreement with Nugget, to assist you in completing your contract. Nugget is approached and decides to enter into this support agreement, not because they want to hide the ball from the vendors, but because they have tremendous exposure to the general contractor, or to the government, if they can't perform their contract. They're ultimately on the hook. So they enter into this agreement, and it wasn't of particular benefit to them, either. They lost a significant amount of money. Turning to the question that you ask about the telescoping argument, I'd like to just briefly discuss that. The agreement, or this question, involves the relationship between Nugget and lower tier vendors of Spencer Rock products. Consequently, it is Nugget's position, under the Leno decision and under the Consolidated decision, that this is actually a question of State law, rather than Federal Miller Act law. The United --" this isn't an interpretation of the contract between the United States and Nugget. This is an interpretation between Nugget and the vendors. Kennedy. Well, he's not interpreting a contract, as he said. He's finding from a course of conduct whether there is an implied in fact contract. There's no terms he's construing. He's looking at, for purposes of the Miller Act, whether a course of conduct produced a relationship that would eliminate the middleman and allow Nugget to be in a direct relationship with a contractor for purposes of Miller Act, right? If I may recharacterize that, I believe what he was looking at is looking at determining if there was a set of facts that would enable the Court to find whether there is an implied in fact contract. I don't see it that way. It seems to me that the question is whether the claimants are too remote under the Miller Act. If they're too remote, they lose, whether they're no matter what the contract is. If they're not too remote, they win, no matter what the contract is. The nature of the contract wasn't the issue. It's remoteness that's at issue. So what the question is, is whether Spencer, the inadequately capitalized rock supplier, can be removed from the analysis for purposes of the Miller Act. And I don't understand why that would be contract dependent and why you'd be construing Alaska law at all. It seems like just straight Federal law Miller Act. Your Honor, we believe the existence of a contract or an implied in fact contract which would remove that remoteness is a question of Alaska law. Why? Because the question of when you find a quasi-contractual relationship is a question that applies Alaska law. But I don't understand why it matters whether you find contractual or quasi-contractual. What matters is whether you can ignore Spencer. My understanding, because I believe if you ignore Spencer, then you find a contractual relationship and avoid the intermediate step. I don't see it. To me, it's more like when you're looking at double-breasting in a union organizing case or when you're looking at a sham corporation in a tax case, you're just deciding whether Spencer should be recognized as an existing entity for purposes of this analysis. If you take — if you adopt your position, Your Honor, then I still believe the judge inappropriately reached — made factual determinations. And if I may — Why can't — why don't the facts show without a genuine issue that Spencer does not   It had a shell with which to perform the job. It did not perform the job. All it was was an empty shell with a guy who drove truck while Nugget, using Spencer's name, performed Spencer's job. Okay. First question. The Harris decision, which relates to telescoping, and the agency issue both were decided after a full factual hearing. It was not a summary judgment determination. The question you're asking is whether there are facts which you can construe contrary to the district court, which would raise a factual issue concerning whether North Star was a mere shell. Yes. Yes. And some of the examples of that are the question is, first, whether Well, maybe we make it a little more direct. I mean, Judge Holland specifically addresses this issue at ER 347. He said, evidence by undisputed facts, and he lists them. And then he goes throughout. So are there specific things in Judge Holland's opinion that you can identify that are, in fact, disputed? Yes. Well, I can point out facts that were before Judge Holland that raised material issues of fact that he disagreed with. All right. Specifically, no involvement between Nugget and Metco during the course of the project, i.e. no control. The only discussions with Metco were subsequent. Shoreside. No discussions with Shoreside regarding the timing and the placement of payment. The only discussions with Shoreside were subsequent to the provision of goods and services. The only discussions Does he assume otherwise? I can't recall. I can't recall. But I thought he acknowledged or said that those were the facts. And he's reciting what went on, but he still infers from all of that, that fact that you've asserted that still doesn't rob the circumstances of a implied-in-fact contract. I think he does not consider those pertinent. We believe they go to the issues of intent and control, which are extremely pertinent to these issues. Okay. But you're saying they're disputed, but he's accepting the fact. You're just disputing the legal conclusion he draws that they are material or immaterial in his case. You'd like to make them material, and he says they weren't. I think that's a fair characterization. Okay. Let me put it a different way, though. It's basically the same question. Could you point me to the right pages in the excerpt so I can look at the affidavits and deposition experts that establish genuine issues of fact? Certainly. No direct contact with METCO. And the discussions were evidence to Record 320. Only discussions with Northstar with respect to the barging schedule, excerpt of Record 326, and contacts directly with subcontractors or second-tier vendors under Harris or Ordinary. Now, why does that show that there's a genuine issue of fact? What we're trying to show here is that there is no control over the vendors. In other words, it is Choice or Spencer Rock Products itself that is directing these parties in how they do their work and how they provide their goods and services. As a matter of fact, Bob Lepore, the owner of Spencer Rock Products, at Record It doesn't say that here. Pardon me? It doesn't say that. I'm looking at page 326. It says there's no discussion between Nugget and Northstar covering Nugget entering into a contract with Northstar. Right. And it says there's no discussion between Nugget and Northstar regarding Nugget paying for Northstar's barge loading services. It doesn't say that there's no discussion between Nugget and Northstar where Nugget tells Northstar what to do. The only instance of that is with respect to the barge, barging. And that, under the Harris decision, is a perfectly permissible communication between Nugget. All communications are permissible. The only question is whether the nominal rock supplier, Spencer, was a, was, should be disregarded. Okay. And I mean, it's perfectly permissible for the general who's got an inadequately capitalized sub that can't perform to just take over the sub and direct the subsubs. There's nothing wrong with it. It's good business. It's just a question of whether the first sub should be treated as existing for purposes of the Miller Act. And in this case, the first sub is existing insofar as they retain primary responsibility for operating the Spencer Rock Products Quarry. That is at page 157, paragraph 12. Mr. Lepore himself indicates that Randy Randolph, the Nugget representative, only appeared on the site six times, approximately six times. That's at record 234. With respect to the control of, of Spencer Rock Products by Nugget, this doesn't raise to the level of the cardinal case. Miller 157, paragraph 12, does the job for you. What it says in the first paragraph, it says, under the contract Spencer Rock remained responsible for operations. That would be responsible to Nugget for operations. That really cuts neither here nor there. And then the second sentence says, under the support agreement Nugget's personnel worked alongside Spencer Rock's personnel to generate rock in the quarry. I don't understand where. And then it continues on with the next sentence, I believe, to reiterate that Spencer Rock Products was responsible. Whose responsibility it is under the contract between Nugget and Spencer. But that really has no bearing on whether Spencer should be disregarded as a sham. Spencer Rock Products entered into these agreements on its own. I mean, even, it's not necessarily a bad thing. It's just that sometimes you pierce the corporate veil, sometimes you disregard the existence of the corporation because of the way it's used. In that respect, Your Honor, I would suggest that what you really look for is the Cargill analysis and the overriding control of Spencer Rock Products by Nugget, which does not exist. If you compare the involvement between Nugget and Spencer Rock Products with the involvement of Cargill over the supplier Warren, you will find a significantly different involvement. What we simply had here was a general contractor who utilized its back charges to, or its labor and equipment, and back charged Spencer for it to assist Spencer in completing his subcontract. Spencer remained an independent entity utilizing, well, had its own bank accounts, made its own decisions, operational decisions, made its own. And in that respect, I would point you to rule, or the record at 157, where Mr. Randolph indicates Spencer retained control of its operations. Nugget had no control over the officers, financial accounts, or employees of Spencer Rock Products. Nor did Nugget ever attempt to lure the vendors into believing that Nugget would pay. Whenever they were communicated with, Nugget indicated that Spencer Rock Products was responsible for Spencer Rock Products' own debt. In conclusion, I believe that there are material issues of fact respecting intent and control, which need to be resolved before this, and that makes summary judgment inappropriate. I will retain two minutes for rebuttal. Thank you. Thank you, counsel. Good morning. May it please the members of this honorable court and board of counsel. My name is Michael Seawright. I represent Northstar Terminal and Stevedore Company. There are two other claimants in this case, Shoreside Petroleum and Medco, represented by Mr. Shamburick. We have agreed that I should take about 15 minutes of the time available to us. May I just get to the heart of what really is my question about this case? What evidence is there in the record that the contract between Nugget and Spencer was a sham, a subterfuge, or collusive? Your Honor, if you're asking is there evidence in this case that Nugget and Spencer entered into their support agreement, we're talking about the second agreement, with an intent, a specific intent at that moment to defraud claimants, there is some circumstantial evidence of that, but I would not say evidence that supports summary judgment, if that is your test. Well, that's part of it, yes, indeed. Because it seems to me that the claim is made that Nugget and Spencer kept this a secret. They didn't announce it to the vendors. But as I read the cases, you have to show, I don't know whether you're talking about specific intent, but a sham, a subterfuge, or that it was collusive. And I was searching in the record for something, and I didn't find it. If it's there, please point me to it. No, I think that evidence is there. And I was listening to one of your prior questions about specific intent. And furthermore, I don't think that one has to show collusion or deliberate or --" Sham, subterfuge, or --" Well, what you need to show --" Let's talk about that. As far as I can see, the great bulk of the cases are pretty strict on how remote the recovering party can be from the contractor. And your party's problem is they're one step too far. And what you've got, as far as I can tell, as authority, is Harris. Now, in Harris, actually, I think the Court rejected the telescoping. And what it said was, we have no quarrel with the cited decisions. And there they're referring to telescoping decisions. Where this has been done in cases involving, and here's where Judge Nelson's words are come from, subterfuge, collusion between the prime contractor and subcontractor, or circumstances indicating the interposition of a straw man, presumably for the purpose of insulating the prime contractor and surety company, from extensive Miller Act liability. We're fearful to rely on such a principle in view of its tendency to destroy the McAvoy rule. And nor are we willing to characterize the party as a paper sub solely because he subbed all work required of him. And there must be circumstances of subterfuge, collusion, or interposition of straw men to warrant elimination of a party in the claimed subcontracts. Now, is there any good authority that goes any beyond that?  Well, there was the, as I recall, I think it was Creosote case. There were two or three opinions that were cited in Northstar's opening brief and discussed somewhat. But really, those were discussed for the context that, one, you don't have to show a deliberate, intentional deceit or intent to defraud. And the factual circumstances can be very different in different cases. You can have a joint venture situation. You can have different factual circumstances. The — in the Harris decision, you had different factual circumstances. I don't think you had anything approaching the interposition of a straw man that you have in this case. Now, that's what you have in this case. You do have the interposition of a straw man. It doesn't look like it's that simple here to me. It looks like construing the facts most favorably to the party opposing summary judgment. We have to do that because it never went to trial, summary judgment. And doing that, what you have is a perfectly ordinary relationship where Nugget is the low bidder, in part because it has a really good deal on the Brock, and Spencer is the low bidder, and they get the job, and then Spencer can't perform. Nugget is either going to fail, fail to perform, or they're going to essentially replace Spencer in its own quarry. And they do that, but not through any sham or subterfuge or anything, just as a matter of good business to perform their duty to the Corps of Engineers. Why isn't that a permissible inference from the evidence? Your Honor, I'll give you several reasons. First of all, Nugget never really gave Spencer much of a chance. It gave — it was two weeks before Nugget moved in. The project work really hadn't — it had hardly gotten underway, the production of the rock. Didn't the bank intervene here? What's that? Didn't the bank intervene? I don't see that as evidence in the case that the bank, per se, intervened. The bank talked to Spencer and basically told Spencer that it wouldn't extend the credit that Spencer understood it would earlier. And then Spencer went to Nugget and, according to Spencer, tried to get out of the job, and Nugget basically said, no, this is what we can do. Or they agreed among themselves. Now, I really think that how they came about this agreement isn't particularly relevant to the situation that Northstar and the other claimants find themselves in. Nugget did keep this arrangement secret from Nugget. Well, it utilized Nugget's — or from Northstar. Well, it utilized Northstar's services. Yes. Can we go to what Judge Holland found on that specifically, his finding or his conclusion, let's put it that way? There says, Nugget engaged in subterfuge in its desire to keep the terms of the support agreement secret. And he talks about what they did. It also required Spencer to keep the terms of the support agreement secret so as to prevent the parties from demanding payment directly from Nugget. Now, isn't that an inference of intent? And why is that undisputed? In other words, to sustain that finding of subterfuge, that's a conclusion about what their purpose was in keeping it secret. Why is that not disputed? It is undisputed that Nugget asked Spencer to keep the arrangement secret. That's a separate case. I'm asking about the purpose. They kept it secret. Okay. Where's the — why is it undisputed that the purpose for that was in order to prevent the parties from demanding payment directly from Nugget? Your Honor, if that was Judge Holland's conclusion, I think it's an unnecessary conclusion. But he has to draw all inferences favorable to the nonmoving party. Well, in other words, what if they kept it secret because they didn't feel it was any of their business? It was just — it was a private transaction. They don't have to open their books up to these — to your clients. That was their purpose. Your Honor, the bottom line is this. They did interpose a straw man. They charged $4 million of work against Spencer Rock on a $1.6 million job. As Judge Kleinfeld indicated earlier, Nugget did do the work of Spencer that Spencer had contracted with Nugget to do. And — Under Harris, doesn't Spencer have to be a straw man from the get-go? I don't think that under Harris — First contract, not the second contract. I don't think that under Harris, Spencer has to be a straw man from the get-go. Spencer has to be a straw man before — or that process has to be underway before perhaps the claimant does the work, which clearly was the case. It seems to me that if I take the Harris analysis, if Nugget enters into a perfectly good-faith relationship with Spencer, expecting Spencer to supply the Rock and Nugget to do nothing more than receive the Rock, just like you'd expect, why doesn't that save Nugget from this language about subterfuge collusion and interposition of a straw man? They haven't interposed Spencer. When they make the support agreement, Spencer was already there. All they're doing is changing their relationship with Spencer because of Spencer's inability to perform. That's quite a change of a relationship, Your Honor. They're stuck with Spencer at that point. What's that? They're stuck with Spencer at that point. They've already confracted with Spencer. Yes. Although these were a series of periodic performances on the part of your clients, weren't they? It was a series of periodic performances, but all of the performance by my client Northstar was actually the memorialization of the support, the so-called support agreement between Spencer and Nugget. It was a done deal. So at the time your clients came forward and entered into the transaction,  by the time my clients did the future work that was called for by their agreement the agreement was an on-credit agreement. And taking effect when Northstar did the work was for future work. I'm just trying to address Judge Kleinfeld's legitimate concern about timing. If this starts out as a straight-up arrangement, and because I understand you to be reading Harris to avoid having to prove either subterfuge or collusion, you're suggesting we should read Harris as if the conduct of Nugget and Spencer Rock, at some time material to your client's relationship to them, became a straw man. That is enough to satisfy Harris. Yes. So even if it started out legitimate, Nugget changed the deal, and your clients thought they were dealing with a viable Spencer Rock. But if they had known the true facts, it's almost a fraud and inducement kind of argument, I suppose. But we won't go off in that direction. I'm just trying to understand what your theory is and how we, if we were to conclude there was a disputed issue of fact as to fraudulent type intent, which is implicit in sham or collusion or subterfuge, but maybe not in simply the interposition of a straw man. And I'm just thinking out loud here. Not in the interposition. How would we – is that how we would – pardon? Well, that – that is my client's position, that there was interposition of a straw man, and it happened definitely before my client did any work. Okay. And I know you also – My client would – and there was a subterfuge. My client wasn't told. Well, okay. But what – who has the burden to tell? In other words, what is – Nugget should say, even though you're contracting with Spencer Rock, you should know we're the real party in interest here? We're the – we're really Spencer Rock? Your Honor, if they're going to receive the benefit of the work and they're going to be there as often as Randy Randolph was there and not say anything to my client, yes, there is that responsibility. I thought the way it worked was that generally people kept their contracts secret. It's kind of like people don't tell their employees what their other employees get paid. They don't tell one sub what another sub is getting paid. They don't tell one sub what the terms are with another sub or what the terms are with the general or any of that because they don't want people getting mad that they didn't get something as good. Your Honor, in this situation, under the Prompt Pay Act, Nugget had the obligation to at least tell the federal government, the contracting officer, what was going on here, and they didn't. They had – they were supposed to inform the federal government before they received progress payments, and they didn't. And there is court authority. I think it's the CALS AC electric case, the famous construction, which was cited in Northstar's briefing, to the effect that the Prompt Pay Act has been – has effectively amended the Miller Act. How does that benefit you, if they didn't tell the government something they should have? Your Honor, the federal government immediately communicated with Northstar  that we believe this is not your responsibility to pay Northstar, et cetera. I have to address one thing before I leave and my time is about up. The focus of all of your questioning has been, and I understand why, on the telescoping remedy. But there was an alternative remedy that was very easy to find. No one can dispute that Nugget controlled Spencer on this project. The control was evident. It secured itself as a creditor and received the money first in line without telling anybody. That control and that interposition and interception of all the money unto itself clearly establishes an agency relationship, and that was argued to Judge Holland too. He said that the remedies or the causes of action were virtually indistinguishable. He had one question about the agency cause of action and, therefore, didn't reach it, but that was answered in the briefing before him. And at that point he said, well, I've already decided this case. You're giving us an alternative theory. I'm giving you an alternative theory, yes. Now, what's the agency theory?  Who is whose agent? Spencer Rock is treated as the agent of Nugget because Nugget controlled Spencer Rock for this project and Nugget intercepted, was a secured creditor, made itself a secured creditor in the second agreement and intercepted the money and paid itself. And that has been briefed extensively in Northstar's briefing, both in the opening brief and in the reply brief, and I do offer you that alternative remedy. I frankly think the telescoping remedy applies. What's that? I don't understand it yet. Nugget doesn't intercept the money. The core pays Nugget. Nugget's expected to pay Spencer. Yes. So Nugget intercepted the money and didn't pay Spencer. It doesn't intercept it. The pass isn't thrown by the core to Spencer. The core throws the pass to Nugget, and Nugget is supposed to hand off to Spencer. It's not an interception. I'm just not following the argument. I'm not disputing it. I'm just not understanding it yet. Well, and I don't understand how that bears on agency. Nugget took the money, and it does bear on agency. There are some cases that were cited in the briefing. It's the Cargill decision is very analogous to this situation where the ---- You're arguing undisclosed principle. Is that what you're arguing? It can be disclosed or undisclosed. According to the Cargill court, it didn't matter. But basically, in this case, you don't tell somebody ---- I'm going through the restatement of agency second in my head. Section 14. I'm trying to figure out how this gets around the remoteness problem in the Miller Act, and I just haven't put it together. Because Spencer is treated as an agent at the point the second arrangement was entered into. Spencer ---- So in other words, it's a direct relationship with Nugget. Yes. Through its agent. Yes. Spencer Rock. It's ---- And how does that relate to the specific contract between Nugget and Spencer? Because under that specific contract, Nugget created the right in itself to, I use the word, intercept the money. In other words, once it was paid by the court, it didn't pay Spencer for the work that Spencer was supposed to do. And it exhibited control in obvious other ways. You don't try to charge. If you're Nugget, you don't try to charge Spencer for $4 million of work on a 1.5 or 1.6 Rock contract unless you were doing a lot of substitution of Spencer with your own personnel equipment and management and everything else. Nugget put its own shooter in the quarry. It put its own supervisor in the quarry. Nugget ran that quarry, and it ran it for Nugget's benefit. And it, my word, intercepted the money that it would have otherwise paid Spencer for that work, and under Agency Restatement Section 14-0, that makes Nugget a secured predator who, once that ---- it starts controlling that other organization, becomes the principal as a matter of law and as a matter of fact, as a matter of the restatement. Therefore, you do, much as in the telescoping remedy, you ---- What's that? The agent becomes ---- No. Maybe I'm trying to speak too fast here. She rocks the agent of Nugget. I think you're using terms differently from what I'm following. I'm still hung up on ---- Nugget becomes the principal. Somebody intercepting a pass when it's thrown to them. Call it a fumble. Nugget ---- I thought you were dealing with Spencer Rock. In fact, you're dealing with Nugget. That's right. Nugget becomes the principal. Spencer becomes Nugget's agent under the law. It has the same effect, really, as telescoping because you eliminate the straw man in the legal analysis. All your time is up. I just want to clarify one thing. Are you separating Northstar from Shoreside and Metco in the sense that it was a done deal when Northstar entered in, and was it a done deal with Metco and Shoreside, the agreement between Nugget and Spencer? I will let Mr. Chamburek address that. I do understand this from the facts, including admissions by Nugget. Spencer was supposed to start its rock production around March 15. By the last week of March and the first week of April, Nugget was in there with equipment that it was trying to charge Spencer for, according to the back charge records of Nugget, and personnel it was trying to charge Spencer for. Now, that's the last week of March and first week of April, and Nugget has admitted, and Randy Randolph has stated, it was about the first or last week of March and first week of April that the arrangement occurred, even though it was memorialized in writing and, you know, the attorneys got around to it or whomever, by and signed by both Spencer and Nugget on April 23, 1997. Now, even if you look at that bright line, April 23, 1997, we have an agreement in hand that gives Nugget this control. My client didn't start any work until about 10 days later. Okay. Mr. Shamburick can address his clients. Thank you, counsel. Thank you very much. Mr. Shamburick, technically, you're already 1 minute and 52 seconds past the end of your time. However, why don't you take 1 or 2 minutes to lay out. Thank you very much. I'm representing two companies that operate out of Seward, Shoreside Petroleum that provided the fuel and lube for this entire operation, and Metco that provided some of the employees. In response to your question, it appears, based on the uncontroverted testimony at Excerpt of Record 107, which is the deposition of Randy Randolph, and then the statements of counsel at page 11, toward the middle of the page, that by the end of March of 1997, Nugget had had to come in and take over the operations because Spencer simply could not fulfill its terms under that contract. From that point forward, Nugget was effectively in control of the quarry and of the entire operations. So the end of March, even though the contract wasn't signed until April 23rd. Right. And, again, I don't think there's any question of fact. If you'll take a look at that excerpt of record and the admission by counsel in the brief, the excerpt of record refers to the deposition of Randy Randolph. There's also some other excerpts of record where Nugget indicates that it was back charging for activities that go through March. So you're basically making the same argument. Same argument, yes. If I could just note, the test that we've been looking at hasn't been developed extensively in case law. And it takes a look at subterfuge, collusion, or circumstances indicating the interposition of straw men. I don't know that there's real collusion here between Nugget and Spencer. Spencer was basically Bob Lepore, and Bob Lepore just had the good fortune of having a big rock quarry close to a port. In this case, really, especially if you take a look at that first material contract, it's a very balanced contract. When they entered into it, I don't know if there was good or bad faith. It was just a business deal in January of 1997. By the time, even before Mr. Lepore was supposed to perform, it was just clear that it was too big for him. He ended up driving a truck throughout this whole project. By the time you get to the support agreement, if you take a look at that agreement and it is part of the record, it's pretty clear that that was a one-sided agreement. All the indemnification is Spencer indemnifying Nugget. It states in there that if there's any dispute, the attorney's fees of Nugget will be paid instead of Spencer. Words have meaning. Contracts are sometimes fairly clear on their face. By that point, this was just Nugget writ large. Bob Lepore was driving a truck. From that point, Nugget sat back, allowed Bob Lepore or Spencer to go ahead and continue with these projects. And there wasn't really much oversight of the three subcontractors. When Nugget needed fuel, Shoreside provided it and states in the letter, I think at the exhibit, or actually for record, 64, 65, we knew this was bonded. We knew there was a payment bond. We knew that this was a Miller Act project, so we would get paid. The same is true with Metco. They provided some laborers. When they were needed for loading there in Seward, they sent the laborers over. So they really didn't have to look to anyone for any specific management or oversight, although it's real clear that this fellow, Lynn Randy Randolph, who had worked at Nugget, at Spencer Rock, and who is now working at Nugget, was the one who was really calling the shots. Kennedy. I have a question, though. You say we knew, your clients knew this was a Miller Act project, but a prior panel of this court concluded that Spencer Rock was a material man and, therefore, wasn't as such, let me finish, covered by the Miller Act. Therefore, your contracts weren't absent some kind of more direct relationship. So when, just in the practical world, a supplier, like your clients, comes to a person down the chain from the prime, what do they do to get actual assurances, if anything, that they are part of the Miller Act protection? There's a letter from a representative of my client, Doug Lechner, to the Corps of Engineers, and that's where he sets forth his understanding. I think that's an excerpt of record 64, 65. That's where he sets his understanding that Nugget would be responsible for this, that he was providing this to Spencer pursuant to the contract with the dispenser. This was at the time that he first started providing this? Not when it was first. No, it was about August 26th or 27th of 1997. And was a copy of that sent to Nugget? A copy was sent to the Corps of Engineers, and then it was sent to Nugget. So after the fact, after these services are provided, he decides that now he wants to make a declaration on his side that this is covered. But at the front end, before he even started out, when he thought he was dealing with Spencer Rock and not Nugget? One of the things that he points out in the letter and then in the affidavit of Doug Lechner is that this individual, the pivotal person, Lynn Randy Randolph, had been working at Spencer before he went over to work at Nugget. So he had the same individual who was just calling, wearing a different hat, if you will, or calling from a different telephone. I understand that. But, see, this is what's troubling me. I'm just trying to put myself on the ground there is how this thing works. There's the Miller Act. Okay, the Miller Act is a crime contract that's between the government and Nugget. And then there's Nugget down to Spencer Rock. Originally the claim was, well, you know, we're subcontractors of a subcontractor. Our court said, no, you're not. You're subcontractors of a material man, and too bad, you're too remote. But maybe you can go back and show that there was some kind of, which Judge Holland went ahead with the invitation and found. But at the first instance, when you say your people go into this deal thinking they're dealing with Spencer Rock, what do they do to make sure at that point that they are, in fact, bonded, covered by all of this? At that point they'd had an agreement with Spencer Rock. And said that they were part, that they were subject to the bond? Not subject to the bond. It was just an agreement to provide. Well, right. So what is it people do out there in the real world to assure that they're really not too remote under Miller Act terms? My understanding is most of these business people don't really understand the nuances of the Miller Act. I'm not surprised. And in Alaska we have a little Miller Act for State construction projects. And I think the average layperson just assumes this is a government project. I can't lean the Crown or the property of the Crown. If it's a federal project, they're sort of aware of the Miller Act and sort of aware that they're supposed to be paid if they provide services and cooperate in the effort. The same is true under the State's little Miller Act. So Shoreside was providing the fuel. And understandably, once everything got developed and the matter got up to this panel a few years ago, there was a determination that Spencer was just a material person. But from sort of a reasonable business person out there, it was their perception that this was a bonded project, so it was safe. They would get paid if they performed. I thank you for the time. Thank you, counsel. Your Honors, just a couple of quick points. At record 146 through 149, it's clearly indicated that it is the bank that is directing Spencer to go to Nugget to obtain the support agreement rather than Nugget suggesting it. Moreover, at record site 325, you will note that at any point, Spencer had the right to disavow or cease seeking support for Nugget. So Spencer was not necessarily a straw man of Nugget. Well, but it's a practical matter, given the record in this case. Spencer Rock was a shell. I mean, are you disputing that he was simply driving the truck? I would dispute that, Your Honor. Specifically, if you look at the record at pages 155 and 156, you will see that Spencer Rock had a significant rock production business prior to this project. And during the course of this project, they also had a contract with ARRC to provide riprap. So they had an independent business as a rock supplier apart from this project. Moreover, they were independent in the sense that they bid to all entities on this project, not just Nugget. This wasn't a straw man or a captive entity such as you had in the case of Cargill. And the straw man issue is similar, I believe, to principal agency. And if you look at the Cargill facts, you'll find that that's very factually specific. It required a full jury determination. And the facts here are different, and Rays indicate that there's not a straw man present. I see that my time is up. The one other point I'd like to make is simply that if you look at METCO, Shoreside, and Northstar, you'll see that the ordering of the services came through, did not come through Nugget. It came through Spencer Rock, another indication that Nugget, who only had approximately six times on-site through Randy Randolph, was not controlling this entity. Thank you. Thank you, counsel. Northstar v. Nugget is submitted. We're adjourned until 9 a.m. tomorrow. All rise. Thank you. Thank you. Thank you. Is there a post office near here? More specifically, is there something paid for? Yeah. There's a United States post office right down the avenue. It's on, I think it's on 3rd. And it's 3rd and, not 3rd and even, it's 3rd and, it's 3rd and North a couple streets, maybe. I know, I can't give you the exact address, but there is one downtown on 3rd and 4th. How far away is it? Is this downtown? Yeah, this is downtown. It stays within a block. Yeah. I've got to go on the 4th and 5th. Yeah. They can. If they can, you can check in the telephone directory. Yeah. Okay, thank you. Okay. See you gentlemen later. Bye. I know, that's okay. Thank you. Thank you. Well, at the end, I basically, that's my desk over there. Let's go. Can we go back to the hotel? Yeah. Yeah, let's do it. Did you have one piece of checked baggage? Did you have one item of checked baggage? I had no checked baggage. Do you want to take two items of checked baggage back? No. No, I don't want to. I guess I can, but I don't want to. What I did last time when I was down here, I had a car at the time. I picked up two, well, I picked up four chairs. Two in my den, two in this drawer. Put two of those checked baggage. I guess I can do it as long as I don't get charged for it. If I do, I guess I'll charge you. Let's see. They won't have to wait for me very long. About half an hour. Here's how we do all that. If I get back at 11.30 or 12, I've been there. I'm not so sure I want to pick them up that night. I know. I know. Well, I know it's kind of imposition, but here's the thing. Why can't I do this? Because I've got a special area to try to get two glass parts of the table. No, I understand what you're talking about. I understand you don't need all this paperwork. This paperwork, I'll pay for it. Okay. Okay. Okay.
judges: Dw Nelson, Kleinfeld, Fisher